3-0-9-0-4-6-2, Joseph Markoff, et al., accounts by Lance Raphael v. Des Plaines Valley Credit Union, et al., Anthony Thomas. You might have thought that with recent financial institutions, wondrous types of examples that we've seen in the media, that that would have passed by Des Plaines Valley Credit Union, but it didn't. The facts alleged in the plaintiff's complaint, in our most recent complaint, paint the picture of a board of directors that not only failed to exercise business judgment, but they actively sought to avoid it. And that would be painted in terms of the allegations regarding the September meeting, where no questions, no comments, no feedback were allowed by the board with regard to the upcoming merger with Argonne. In fact, so basically they sought to avoid any input of any facts that would have apprised them of things that might have allowed them to exercise some form of business judgment. To put it into perspective, why don't we look at the Des Plaines Valley Credit Union prior to the merger. It's a small credit union, solid returns, solid service, personable service, which typifies most of these small credit unions. It had retained earnings of $1.4 million, or 18% of its total assets. In May, May 31st of 07, Argonne reported losses of $301,000. That was something that apparently didn't change minds or even factor into the minds of the board of directors. What percentage of that was their assets? Pardon me? What percentage of that was their assets? Of Argonne's assets? Oh, I don't know what the exact percentage of that was. But when you total up all of the losses during the entire time from the moment that Des Plaines Valley was considering merging with Argonne to the last November statement, I think the total was approximately $1.8 million in total losses, which if you compare that to their stated retained earnings, it's a full 10% of Argonne's own retained earnings lost over this time period. And the $1.8 million in losses over these three reported periods of May 31st, a loss of $301,000, August 31st, a loss of $646,000, and November 30th, a loss of $880,000, that $1.8 million in losses dwarfed the entire retained earnings of Des Plaines Valley Credit Union, which was only $1.4 million. Argonne had, at least according to the report in the notice that was sent out to the Des Plaines Valley Credit Union members, had, I think, 10% retained earnings to total value. And Des Plaines Valley had 18% when you mixed them together, even with what we would allege as being incorrect numbers, because they came from June and there's also some other factors that would make them incorrect numbers. But even if you were to take those numbers at their face, it dropped the retained earnings after the merger down to 11% of the total assets, which is the Des Plaines Valley Credit Union members experienced a 40% drop in their ratio of retained earnings. And that's not to say that the entire loss for them was completely and purely financial. I mean, you're talking about people who got to participate in – credit unions should be taken outside of the context of a normal corporation. We all invest in corporations, we buy stock, we buy mutual funds. That's a pure investment tool for most of us. A credit union is made up of members. There is a value that is inherent to being a part and a participant in a local community institution like a credit union. And what was being done is they were being touted with this other larger credit union. And primarily the big selling point was it was this incredibly financially strong institution. And the truth of that is apparently incorrect. Well, the thing – the one number you haven't thrown out there are those Argonne's assets. Total assets we can throw out there if you want to. It's not a big deal, because remember, you're dividing that total assets by the total number of members of the credit union. You have a larger group of people together, you're going to have a larger group of assets. That doesn't mean that it's a financially strong institution. The proof of that is I sued banks a lot, and Chorus was a fantastically large institution right before it died after we settled a case with them. I mean, you have small institutions that are incredibly financially strong, Northern Trust, versus Bank of America, which are incredibly large institutions that are not financially sound. This is somewhat of the same picture here, but magnified by the fact that these are members in this institution, not just passive investors in stock. It's not fair to say to someone, you're going to give up your membership in this small, financially sound institution and go to this larger, with $180-something million in assets. But when you factor in what assets are retained earnings and what aren't, it's a much weaker institution. It's not fair to have people do that and tell them things that are not correct. It's just not right. You have to be given a fair shake to make an informed decision before you buy on to the next institution. That brings me to the idea of not having standing here. There's two different types of actions that you can bring against a corporation, or in this case against a credit union. One is direct, one is derivative. Here, the direct cause of action is the impairment of the informed right to vote on what this institution, what my institution is going to do. Again, dissimilar from the type of voting that's discussed for Delaware corporations under Delaware law, where you're passive voters getting some sort of a flyer in the mail and it's a pure tool for investment, this is a vote on where my money is going to be, where am I going to be serviced with my bank. This is who's going to be employed at my bank, or in this case, not a bank, a credit union. So every member gets to vote on each hire, each employee. No, no, no. The board of directors makes those types of administrative decisions, but on large decisions like are we going to be at this institution or are we going to be under the umbrella of some other institution, no, clearly that is something that every member of the institution is allowed to vote on. And the authority for that is? The credit union act. I mean, there's the statute for which this court is to operate under. The law for which this court is to operate under is not Delaware law, it's Illinois law, and it's not corporations law, it is credit union law. And ironically, this is a case of first impression for that. And that's my question to you. I mean, you're alleging a special injury in Marcos. Their voting rights were impaired. Wouldn't your argument be better if, in fact, they had voted the other way based on what was in this notice? They voted against the merger. Oh, if they had been fooled? Yeah, that would have been a great claim for common law fraud because you'd have to show reliance upon the misrepresentation. You were fooled and thus you went along with the fraud. But under consumer fraud, the Illinois Consumer Fraud Act says you don't need to be fooled. You have a representation made with the intent that someone relies upon, made in the course of trade or commerce, and that's the allegation, which is why the legislature came up with the Consumer Fraud Act to fill in gaps that common law fraud has like that one. You would have to rely on the representation. But in Spill Yards, you aren't saying the same thing as Spill Yards. I mean, in that case, they're saying that their voting rights were diluted. You're saying that you were not allowed an informed right to vote. Both, because here, the case here is brought on behalf of all. Here, there's some conflation between direct and indirect. We've alleged both in this complaint, and that may be where, in some respects, the lower court was confused. So you're saying you have a direct and a derivative action of both? Absolutely. We would say we have both, but at worst, we have one or the other. We would say we have both. On the direct level, our voting rights were impaired. There was a false representation made to all of the members of the credit union to induce them to make a vote, yes, let's move in with Argonne. They're a financially strong institution. We're going to provide you with information about how financially strong it is. Oh, oops, it happens to be information that is horribly out of date, June as opposed to August. And no, we're not going to tell you about any of the losses that Argonne is suffering that are piling up. That's the direct misrepresentation. That gives me a direct claim for the impairment of my right to vote because you're trying to procure my vote based on false representation, which the fact finder will decide whether it's sufficient or not sufficient to do. Now, on the indirect level, or what's called a derivative action, I'm standing, in a sense, in the shoes of the corporation. My claims are the same. The vote got passed, and now the corporation has been damaged to the tune of whatever the diminution in valuation of those shares are, and that you would look at as the retained earnings. Initially, Displains Valley had retained earnings of, I think, $1.4 million, which constituted, according to the notice, 18% of their total assets. Argonne had a larger number, but it was distributed amongst a larger group of people, and it constituted, I think, 10% of the ratio between retained earnings and the total assets of the entity. When you went through the whole process and merged, according to this notice, the result was the valuation for the Displains Valley credit union members went down to 11%, and the valuation for all of the members in Argonne went up to 11%. So everyone at Displains Valley lost, and everyone at Argonne won. In terms of the retained earnings? In terms of the retained earnings, which is basically the profit of the entity. It is that which that entity could then utilize to do different wonderful things for its membership. But that's a pretty fluid thing. The other assets, can you talk about those a little bit more? Because, as you said, those retained earnings statements can change dramatically, like you indicated, from June to August, which is a blink of an eye in those terms. So the other assets do have a meaning. Well, these statements of assets have some significant meaning, and if we had gotten into discovery, I would have probably been able to show that those statements were false because we were able to look at Argonne's disclosure of its total assets in May. And it said it had undivided earnings of $14.5 million on its statement of financial condition. And this is in Argonne's website. But mysteriously, the next month, this statement that was used in the August 30th notice, the August 30th notice contained what was supposed to be an assessment of net worth as of June 30th, and so basically 30 days later, they're claiming that Argonne had $18 million in retained earnings. So there was like this over $3 million jump in a 30-day period, which is just really bizarre. We weren't able to explore this because, the Court should remember, we were dismissed on a motion to dismiss on the pleading stage. We didn't get anywhere with any of this. And that's a huge discrepancy that was troubling to us, but we couldn't make anything of it without going through discovery to find out a little bit more. So we pled our complaint on the things that we could conclusively show were just flat wrong, not ones that were really what I view to be the more juicy facts, that we don't have what the other side's explanation as to those facts would be. Does that answer your question, Your Honor? No. I mean, I still, you know, when you say that disclaims all those members lost and Argonne won, you're only telling us part of the story because you say you can't tell us what the assets were, the other assets other than retained earnings. Oh, no, I'm sorry if I've misspoken. No, I can say that definitively the members of displayings lost and definitively the members of Argonne won, even just looking at what was provided in what appears to be a false statement. I'm saying that the things outside of the false notice or the false information provided in the notice shows an even bleaker picture, and that would be the fact that Argonne's own statements that were on their website show the losses of net income that if you add them up, these figures don't add up. Like there's something going on here that is very difficult to understand. Your time is up. I'll answer it in my rebuttal. Thank you, Counselor. May it please the Court. I think the answer to your question, Your Honor, is 0.38%. If ever there was a case where the business judgment rule should be applied, it should be applied to protective directors of the board of the Displayings Valley Credit Union. I'd like to address the numbers that have already been discussed here because they are the crux of the plaintiff's entire claim, both the claim of breach of fiduciary duty and they underlie these claims of standing, the arguments for standing. What plaintiffs claim is that there were losses in the period immediately prior to the merger at Argonne. Those losses amount to approximately $650,000. I believe the figure is 646 and something. Approximately $650,000. The assets of Argonne Credit Union were approximately $167 million. And plaintiff's claim bases the entire claim on the fact that losses of less than $1 million were not made known to the members of the Displaying Valley Credit Union. I submit that that is a trivial number. And the numbers that the losses that the plaintiff talks about following the merger really have little relevance here because the claim is based on misrepresentations and what did the board know before and what did they reveal or what they should have revealed at the time. But the losses the plaintiff even adds up are still less than $2 million when we're talking about Argonne Credit Union of $167 million. And, of course, if you add in the additional assets of the Displaying Credit Union, then the percentage of losses is even smaller, of course. And we're still talking about less than one-half a percent. Now, and this does not help plaintiffs establish direct harm or individual standing. For individual standing, they do have to establish direct harm. And in this case, plaintiffs are not actually claiming, the damages they're claiming are dilution of assets, dilution of the share values. Pardon me. Dilution of share values. That's a classic case of indirect harm. It's a harm primarily to the corporate body and only indirectly to the shareholders. And plaintiffs seem to realize that because they don't really focus on those damages. They focus, as counsel said, on the right to vote. Now, the only case in Illinois that actually deals with the right to vote as a basis for direct harm is this Spilliards case, which is based on Delaware law, but it actually deals with this issue of a right to vote. But it's a very different case from what we have here. It involved an express restriction on voting power of the directors. And the court held that that was a restriction on the contractual voting right. Now, plaintiffs seem to realize, again, in their reply, that that case doesn't help them. So they went and looked at other cases. They found this nice case from the Ninth Circuit, which is also based on Delaware law, the Nisers case. And, indeed, the Nisers case and the current state of Delaware law seems to be that if there is an informed right to vote that underlies a claim, this can satisfy the standard for a direct claim. However, that does not help the plaintiffs in this case. Because as in Nisers, the case they cite, and as in the Delaware cases that it follows, such as J.P. Morgan Chase, which I provided to you last week, the consequences are that there are no compensable damages. He's still looking for dilution of assets, damages. The courts have held that there is no, as in the Nisers case, they held there's no economic loss from this deprivation of the right to an informed right to vote. The Delaware courts have held that, as in J.P. Morgan Chase, that there is no logical or reasonable connection between the harm, the individual harm, the right to vote, the informed right to vote, and the damages that are being sought. And the court held that there is no compensable damages. In both cases, those claims were dismissed as a result. And the court in J.P. Morgan Chase went further to say that there are no nominal damages available as well, especially where you have a situation where the entity with which you're merging is an independent entity and not an entity that's controlled by majority shareholders, for example. So the result is the same. The case is dismissed whether it's based on a lack of individual standing or it's based on a lack of compensable damages. Nor does the plaintiff's adequately alleged derivative standing. And, of course, for derivative standing, you have to allege either the demand, which also involves the obligation to allege that any refusal of demand was in violation of the business judgment rule. They don't really make any effort to do that. They make a passing effort to claim that there was a demand made, but they make no effort to claim that the refusal, if there was one, of that demand was a violation of the business judgment rule. In fact, what the plaintiffs focus on is the argument of futility. And, again, this does not succeed either. The futility argument has two prongs to it. One is either a lack of disinterestedness or lack of independence, on the one hand, of the directors. Or the second prong has to do with whether the action of the board was a valid exercise of, yes, the business judgment rule again. Plaintiffs make little effort to allege any lack of disinterestedness or independence in this case. These directors had no personal stake in this matter that was different from anybody else, and there is no allegation that they acted with any kind of self-interest or the kinds of things we see in many of the cases where futility is a basis for derivative suit. Instead, plaintiffs focus on the second prong, and we come right back to the same allegations. Namely, that is the second prong, which is they claim that there was not a valid exercise of the business judgment rule, of business judgment. And this is based, again, on these numbers that supposedly were these losses of $650,000, which they contend should have been made known to the members. Again, I submit that on its face, and in fact the cases say that this business judgment, these allegations have to be egregious on their face. That's the law. I submit that a point less than one-half percentage loss relating to assets is not even egregious on its face. So whether you examine the procedures that were followed by the board or you look at the end result that plaintiffs are claiming, you do not have a, you cannot overcome the business judgment rule in this case. The business judgment rule, of course, is also the defense to the underlying claim of breach of fiduciary duty, and there's very little more to say than that. The basic claim is that they should have known about these numbers, they didn't provide these numbers, and therefore they breached the fiduciary duty. And again, I think on its face, this is not a valid claim of failure to exercise business judgment. So I think the underlying claim also fails on the same basis. Now, the Comp 2 is based on the Consumer Fraud Act. It's based on exactly the same allegations and has the same kind of problems, but it has additional problems, namely that it doesn't come within the scope of the Consumer Fraud Act. In the first place, this is not a sale. This is not a transaction. There's no purchase, there's no specific investment by the shareholders in this action, which is basically, which is nothing more than an approval of a merger. Therefore, it is not a transaction under the Consumer Fraud Act. It is not a sale or purchase or distribution. In addition, even if it does come within the scope of the Act, it falls within the exception to the Act. The Consumer Fraud Act contains an exception for actions that are regulated by state law and approved by a state agency. That's exactly what we have in this case. And that's exactly what the Aurora Firefighters case said, that would apply in a credit union case. It didn't apply in that case, but they held that in that case that the Credit Union Act, following those procedures, would in fact fall within the exception to the Consumer Fraud Act. And in this case, we have that kind of thing. We have procedures that were set forth by the Department of Professional and Financial Regulation. These procedures and forms were followed by the Des Plaines Valley Credit Union and its board. They were pre-approved. The merger was pre-approved, and once the merger decisions were made, it was approved after the fact as well. So we have the exact kind of thing that I think is contemplated in the Consumer Fraud Act, where you have a regulated industry and an organization that follows the regulations entirely. Finally, although because we believe there is no claim here and there's no standing, we really don't. We think the issue of whether Ms. Markoff executed a valid release of her claims is really not. It's not necessary to reach that. And in fact, we will stand on our argument there. We believe that she did because the merger issues were certainly contemplated. They were even referred to in the release itself, and we believe it's broad enough to cover that. Plus the actions, there's some argument about whether the actions that are being brought here are after, subsequent to the release, that is, was she releasing future claims? Well, the crux of their claim is that the board abused its authority in approving the proposal for the merger. That took place before she signed. The allegation is that the proxy solicitation was not complete, didn't include this reference to these losses. That actually took place before the release became effective. The only thing that occurred after that was the merger meeting itself. If you have no further questions? Thank you. Thank you, Counselor.  All right. Well, last thing first is obviously the fact that this bank went through the procedural process to, I'm sorry, this credit union went through the procedural process to merge with another credit union is sort of a nonstarter. I mean, the banking industry as a whole is highly regulated, and that didn't stop massive misrepresentations to persons across our country. So the Consumer Fraud Act, the case law says, applies to credit unions. That's the case. The lower court says, with regard to the business judgment rule, a total disregard of the fiduciary duties to members of the landmark mutual was enough to rebut this concept of this blanket business judgment rule. I'm not sure where counsel got this idea of a .1 percent diminution in value, but I think it's disingenuous because, frankly, the diminution in value is based on what the value of that member themselves has. And the facts are that, according to the notice that was provided, Displains Valley Credit Union had $1,414,000 in change in retained earnings for a total value of $7,656,000, which constituted 18 percent of the total assets of that bank. And comparing that to Argonne, they had an $18 million retained earnings, but it was spread out amongst 167 million in assets, or 10.75 percent. So it's axiomatic that if you have $100 and it's diminished by 40 percent, it doesn't matter whether it's diminished by 40 percent into a big pool of a billion dollars or not. It still hits you, the individual member, the same way. And for this group of members, the diminution in value was roughly 40 percent for them. That's how it affected them. That's not some small, minuscule type of diminution. If they, for every $100, they had 18 percent retained earnings, and it dropped down to $11 retained earnings at the end of the merger, they lost $7 in retained earnings. For every $100 that they had invested in this credit unit. Those damages have to do with the derivative cause of action. There's two separate tracks here. The derivative cause of action, yeah, we have to show that there was a pre-suit demand. We've shown factually two pre-suit demands. One was the injunctive action brought by Paul Markoff. The other is the allegations about what was going on at the September meeting, where no questions, no voting, no anything were being allowed by the board. Those show two separate pre-suit demands or facts that would lead a trier of facts. You believe those were pre-suit demands. And they also show futility. The board didn't want to respond to any of them. And that's sufficient to give you standing for the derivative cause of action. After that, then we're talking about diminishing in value. Now, the separate track, which I think Your Honor was talking about, for the direct cause of action pertaining to voting rights, the damages are separate. They're the loss of being serviced by the bank of your choice. They're more esoteric damages than pure and simple loss of value in shares of a credit union. I go to this credit union because I get a certain level of service, a certain level of responsiveness that's associated with a smaller institution than going to a larger institution. I know myself, I personally do that. I don't bank at the XYZ Bank because I am just one of millions of people at the XYZ Bank, and I don't get the level of service that I do get when I am one person amongst a smaller group of people at a smaller institution. How do you define esoteric damages in this context? Well, a jury does that, frankly. I mean, I don't know. What kind of jury instructions would you give a jury on esoteric damages? Oh, you know, I don't know that I'm prepared here to lay out jury instructions because I didn't get past the pleading stage. But you are asking for damages. Yeah, I will be asking for damages associated with the loss of my use of this bank on a direct level because of the fraud involved in getting me to go along with this one vote as opposed to what I would have done had I known all the facts. And what kind of damages does the law say that becomes? What? I'm sorry? I mean, how is that defined in the law? Well, I don't know. I really don't. I mean, but, you know, rights such as freedom of speech, freedom of this, freedom to vote, those are sometimes damages that are not quantifiable yet the law recognizes them. And I would say that the case law here recognizes the right to vote as something that can be impaired. I mean, the case law that we've cited to does that. So whether the damages are, quote, nominal for the purposes of establishing you had this right and we asked for a dollar, I don't know whether that's how it will flesh out at the end. But certainly testimony from members in this credit union can flesh out what they feel, and it will be an after-the-fact type of inquiry. So now you're in this new institution. How does it compare to the old one? What would you have done? Thank you, counsel. Thank you. Thank you, Your Honor. Well, the court will take this matter under advisement and rule with dispatch. And we'll not.